371 So.2d 1037 (1979)
Robert J. ROGERS, M.D., Petitioner,
v.
STATE BOARD OF MEDICAL EXAMINERS of Florida, Respondent.
No. EE-454.
District Court of Appeal of Florida, First District.
January 9, 1979.
Rehearing Denied January 31, 1979.
*1038 Andrew A. Graham, Cocoa, for petitioner.
Michael Schwartz, of Slepin & Schwartz, Tallahassee, for respondent.
BOYER, Acting Chief Judge.
By this proceeding review is sought of an order of the State Board of Medical Examiners of Florida (the Board) approving and effectuating a recommended order of a duly appointed hearing officer. The question presented is relatively narrow, viz: To what extent does the State of Florida have constitutional authority to prohibit a nonharmful mode of medical treatment by a licensed physician after full disclosure to, and election by, a patient? Petitioner also seeks a declaration of invalidity of F.S. 458.1201(1)(p).[1]
Petitioner is, and at all material times has been, a practicing physician in Brevard County, Florida. In June of 1974 a nonresident daughter of one of petitioner's patients wrote a letter to the Brevard County Medical Association (BCMA) inquiring about a medical procedure or methodology known as chelation therapy, as a result of which correspondence BCMA commenced an inquiry into chelation therapy and its use by petitioner. Several hearings were held and ultimately the BCMA ordered petitioner to discontinue the use or practice of chelation therapy. Petitioner refused and was expelled from the BCMA. As a result of that expulsion, pursuant to F.S. 458.1201(1)(p), the respondent Board issued an administrative complaint following which a hearing was held on September 10, 1976. In due course the hearing officer filed a recommended order which was thereafter approved and adopted by the Board. Petitioner was reprimanded; ordered to immediately cease and desist from engaging in the utilization of chelation therapy in the treatment of arteriosclerosis unless and until authorized by the Florida State Board of Medical Examiners and his license to practice medicine was placed on probation for a period of one year. Review was then sought in this court.
The record reveals that chelation therapy consists of a series of intravenous injections of a chelating drug, usually disodium ethylenediamine tetraacetic acid (hereafter disodium EDTA, Na2 EDTA, or EDTA). Each injection takes approximately three to four hours to administer, and a normal course of *1039 treatment usually involves twenty such injections. The treatments are specifically intended to treat arteriosclerosis (hardening of the arteries), therosclerosis (deposits on the inner lining of the arteries), and other generalized circulatory deficiencies caused by excess calcium in the circulatory vessels. The common chelating agent, Na2 EDTA, was originally discovered by I.G. Farben in the 1930's and is widely used as a food preservative. EDTA intravenous treatment is often recommended for lead poisoning and other diseases requiring removal of heavy metals from the body. Chelation treatments were widely used during World War II in treating sailors who had contracted poisoning from leaded paint. Since World War II more than 1500 scientific articles and studies have been published concerning practically every application of the chelating process in the body. Many of those articles are contained in the record.
The precise chemical reaction whereby metals, or calcium, are removed from the body through chelation is not yet completely known nor understood. However, through the years, many doctors have observed that after EDTA infusion, the urine calcium level rises and remains at relatively high levels for some months after administration of the treatments. The theory, now generally agreed upon by chelation proponents, is that the chelating salt binds with ionic calcium in the blood, causing a temporary calcium deficiency in the blood. This is rapidly replaced by calcium in precipitate form ionizing in the bloodstream. This calcium, known as metastatic calcium, comes from the walls of the blood vessels and from calcium precipitate in every cell. Many experts believe that the metastatic calcium sludge in each cell causes the cells gradually to disfunction. This phenomenon, coupled with the better known effects of calcium deposits on the interior walls of the blood vessels, results in a gradual decline in blood flow and cell function. Thus, if the pernicious calcium buildup can be prevented or reversed, cells and vessels can continue to function well into old age, reducing the inevitable effects of hardening of the arteries and other vascular occlusive diseases.
The record is replete with claimed instances of dramatic restoration of blood flow to the extremities resulting in arrest of gangrene, restored sensation, increased temperature and return of normal color to toes, fingers, hands and feet after chelation treatment. In one exceptionally dramatic case history, Reynolds Hall, a patient of petitioner, allegedly regained his sight during his seventh chelation treatment.
Chelation therapy is, then, infusion of a chelating agent (generally Na2 EDTA) into the blood stream over several hours, a treatment which is repeated about 20 times, generally over a period of a month or more.
The record reveals that over one million persons die each year in the United States from the effects of vascular occlusive disease. Ultimately, vascular occlusive disease affects all persons to a greater or lesser degree. Yet few treatments are known which combat the disease. Bypass surgery may be effective if the patient can tolerate surgery,[2] if the occlusion is localized, and if it is accessible to the surgeon.
Vasil dilator drugs can temporarily relax blood vessels, allowing increased flow, if the inner walls are not covered by calcium plaque which restricts elasticity of the vessels. Another factor which contributes to the advancement of vascular occlusive disease is diet. Thus, if a patient reduces his intake of calcium and cholesterol the progress of the disease may be slowed. The only other alternative treatment known is chelation. Chelation is intended to remove the calcium that is the cause of the disease.
There is no doubt that the state has the authority, even duty, to control admission of persons to the practice of medicine and to prevent incompetent doctors from injuring patients. (Page v. State Board of Medical Examiners, 141 Fla. 294, *1040 193 So. 82, 83 (Fla. 1940) See also Page v. Watson, 140 Fla. 536, 192 So. 205 (1938)) The state has broad powers where the health of its citizens are concerned. (Barsky v. Board of Regents of University of State of New York, 347 U.S. 442, 74 S.Ct. 650, 98 L.Ed. 829 (1954)). The legislature has a right to prescribe reasonable rules and regulations that shall control the practice of medicine. (Page v. State Board of Medical Examiners, supra.) Such authority is, however, limited in that such rules and regulations must bear a reasonable relationship to the public safety, health, morals and general welfare. (Stadnik v. Shell's City, Inc., 140 So.2d 871 (Fla. 1962))
The Florida case most explicit on the issue of state authority to control a profession is Golden v. McCarty, 337 So.2d 388 (Fla. 1976), in which the Supreme Court upheld a statute which required tattooing to be performed by a licensed doctor or dentist or by a person under the direction of one so licensed. In upholding the statute involved in that case the Supreme Court clearly applied a harmfulness analysis, stating:
"What is harmful or injurious to the public is for the Legislature to decide and courts should not substitute their judgment therefor [citations omitted]". (337 So.2d at page 390)
In that regard it is relevant to note that neither BCMA, the hearing officer nor the Board has made any finding that chelation therapy is in any respect harmful or hazardous to the patient. Rather, the Board's decision appears to have been based upon the hearing officer's administrative determination that chelation therapy is "quackery under the guise of scientific medicine".
By far the most famous in-depth analysis of state interest vis-a-vis health regulatory schemes was employed by the courts in deciding the several oft cited abortion cases. In Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), Mr. Justice Blackmun, speaking for the court spoke of the relationship between the patient and attending physician, holding that the initial decision as to whether or not to terminate a pregnancy is one that is purely personal to the mother and between her and her attending physician and that any unreasonable governmental interference must yield to the mother's right of privacy. The right of privacy, Justice Blackmun observed, may be founded on the Fourteenth Amendment's concept of personal liberty and restrictions upon state action or upon the Ninth Amendment's reservation of rights to the people. The right to make that private decision by patient and attending physician as to whether or not to terminate a pregnancy, even over the objection of the father, was recognized and approved by our Sister Court of the Fourth District in Jones v. Smith, 278 So.2d 339 (Fla. 4th DCA 1973).
The record clearly reveals that chelation therapy is widely used as a "treatment" for arteriosclerosis, though by a definite minority of the medical profession. There is no evidence that petitioner ever claimed that chelation therapy was a cure for arteriosclerosis. Indeed, the record reveals that petitioner allowed his patients to make their own choice of treatment after a full disclosure that chelation therapy had not been proven effective and was held in disfavor by the main stream of the medical community.
In Jones v. Smith, supra, the court stated:
"* * * `the abortion decision and its affectuation must be left to the medical judgment of the pregnant woman's attending physician.' The attending physician, in consultation with his patient, is free to determine without regulation by the state, that in his medical judgment the patient's pregnancy should be terminated. The initial decision to terminate a pregnancy, then, is one that is purely personal to the mother and between her and the attending physician, and any unreasonable governmental interference must yield to the mother's right of privacy." (278 So.2d at page 341: Emphasis the Courts)
The right of the patient was further emphasized by the author of the Jones v. Smith decision wherein he stated:
"* * * In Babbitz v. McCann, U.S.D.C.E.D.Wisc. 1970, 310 F. Supp. 293, 299, the Court observed:

*1041 "`As long ago as 1891, in Union Pacific Railway Co. v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891), the court said:
"`No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. As well said by Judge Cooley, "The right to one's person may be said to be a right of complete immunity to be let alone."' (Emphasis added)
"See also specially concurring opinion of Mr. Justice Ervin in Walsingham v. State, Fla. 1971, 250 So.2d 857, and Young Women's Christian Ass'n of Princeton, N.J. v. Kugler, U.S.D.C.N.J. 1972, 342 F. Supp. 1048." (278 So.2d at page 342: Emphasis the Courts)
We emphasize that we do not have here involved controlled substances such as those enumerated in Florida Statute 893.03, nor has there been any allegation or proof of fraud, misrepresentation, coercion or overreaching. Neither does the record even suggest any harm or potential harm to the patient as was the circumstance in Golden v. McCarty, supra. In each instance, as already noted, petitioner's patients made an informed election.[3]
Article I, Section 2, of the Constitution of the State of Florida provides that: "All natural persons * * * have inalienable rights, among which are the right to enjoy and defend life and liberty, and to pursue happiness * * *". We hold that under that provision of the Constitution, in the absence of a demonstration of unlawfulness, harm, fraud, coercion or misrepresentation, respondent Board is without authority to deprive petitioner's patients of their voluntary election to receive chelation therapy simply because that mode of treatment has not received the endorsement of a majority of the medical profession. It necessarily follows that under such circumstances respondent Board is without authority to prohibit petitioner from administering chelation therapy.
History teaches us that virtually all progress in science and medicine has been accomplished as a result of the courageous efforts of those members of the profession willing to pursue their theories in the face of tremendous odds despite the criticism of fellow practitioners. Copernicus was thought to be a heretic when he theorized that the earth was not the center of the universe. Banishment and prison was the reward for discovering that the world was round. Pasteur was ridiculed for his theory that unseen organisms caused infection. Freud met only resistance and derision in pioneering the field of psychiatry. In our own era chiropractic treatment has been slow in receiving the approval of the other professions of the healing arts. We can only wonder what would have been the condition of the world today and the field of medicine in particular had those in the midstream of their profession been permitted to prohibit continued treatment and thereby impede progress in those and other fields of science and the healing arts.
Relevant to our reasoning is the following excerpt from Reprints of Medical Literature on Chelation Therapy Compiled by Harold W. Harper, M.D. and Gary F. Gordon, M.D., which appears in the record:
"Orthodoxy in medicine is like orthodoxy in any other professional field  it starts as a theory or tentative belief in some particular course of action. As the theory *1042 is expounded whether it is correct or incorrect, it begins to be believed by its proponents and begins almost to challenge a comparison with a religious belief. It begins to be held as a passionate belief in the absolute rightness of that particular view. Right or wrong, a dissentient view is regarded as a criminal subversion of the truth and the holder is frequently exposed to slander and abuse by his orthodox colleagues. In the history of medicine, this attitude maintained the orthodoxy of the views of Galen for 1200 years or more. It was the dead hand of orthodoxy that delayed the advance of knowledge through the Middle Ages. Even today, these same oppressive forces may shackle the advancement of medicine. It is so easy to hold orthodox views in the midstream of medicine. It is only on the edges of the stream of medicine in which advancement can take place. On the edges of the stream there have always been men of advanced views from Harvey, Pasteur, and Fleming to Jonas Salk who have pioneered the advancement of medicine; even in the face of criticism from their own colleagues.
* * * * * *
"The orthodox view of Arteriosclerotic Vascular Disease is surgical intervention where possible, and at an enormous cost, or let the patient die. We as well as our orthodox colleagues, must remember the words of the oath taken on the day of graduation from medical school `and I will do nothing to harm the patient'."
Finally, petitioner urges that since there are no legislatively prescribed guidelines which delimit the exercise of the power granted by F.S. 458.1201(1)(p), upon which statute respondent bases its complaint against petitioner, the statute is therefore an unconstitutional delegation of legislative authority in violation of Article III, Section 1 of the Florida Constitution.
Being mindful as we are that courts should not pass upon the constitutionality of a statute if a case in which the question arises may be effectively disposed of on other grounds[4] we refrain from addressing that issue, since we have already determined that the order of respondent Board here sought to be reviewed must be quashed. However, we would be less than candid were we not to here acknowledge that several recent decisions of Florida courts cast grave doubts on the statute's validity.[5]
The order of respondent Board here sought to be reviewed is
QUASHED.
MELVIN and MILLS, JJ., concur.
NOTES
[1] In addition to the constitutional questions presented, petitioner originally assigned as error numerous alleged procedural defects. However, stating a desire to seek resolution of the fundamental underlying issue regarding the extent of permissible intrusion by the State into the doctor-patient relationship, he subsequently abandoned the non-constitutional issues.
[2] The record suggests that approximately 12,000 persons die each year from such surgical procedure or its effects.
[3] The patients were specifically excluded from testifying at the BCMA hearing. In the proceedings before the Board an untimely motion on behalf of the patients to intervene was denied. At the hearing before the Board one of the Board members stated:

"I think that having a string of patients come up with anecedotal stories about how much better they felt the next day or the next year would not be admissible in any scientific inquiry into the effectiveness of any mode of treatment, and I think that that would not be helpful, nor would it protect the rights of the petitioner, or the health of the patients, which is what we are concerned with. Patients themselves are not competent to make those judgments."
[4] Singletary v. State, 322 So.2d 551 (Fla. 1975); Stembridge v. Harwitz, 303 So.2d 85 (Fla. 3rd DCA 1974) and U.S. v. Rias, 524 F.2d 118 (5th Cir.1975).
[5] See for example, Lewis v. Bank of Pasco County, 346 So.2d 53 (Fla. 1976); Conner v. Joe Hatton, Inc., 216 So.2d 209 (Fla. 1968); Sarasota County v. Barg, 302 So.2d 737 (Fla. 1974); Lewis v. Bank of Pasco County, 346 So.2d 53 (Fla. 1977); D'Alemberte v. Anderson, 349 So.2d 164 (Fla. 1977); and also Askew v. Cross Key Waterways, 372 So.2d 913 (Fla. 1978).