387 So.2d 937 (1980)
STATE BOARD OF MEDICAL EXAMINERS OF FLORIDA, Appellant,
v.
Robert J. ROGERS, M.D., Appellee.
No. 56096.
Supreme Court of Florida.
September 4, 1980.
Michael I. Schwartz, Tallahassee, for appellant.
Andrew A. Graham of Reinman, Harrell, Silberhorn, Moule & Boyde, Melbourne, for appellee.
ALDERMAN, Justice.
This cause is before us on direct appeal to review the decision of the District Court of Appeal, First District, in Rogers v. State Board of Medical Examiners of Florida, 371 So.2d 1037 (Fla. 1st DCA 1979), which construed a provision of the Florida Constitution. Although we find it unnecessary to the disposition of this cause to reach the constitutional construction given article I, section 2, Florida Constitution,[1] by the district court, we affirm the result of the district court's decision because, under the particular facts of this case, it appears that the action of the Board of Medical Examiners restraining Dr. Rogers from further utilization of chelation treatment was an arbitrary and unreasonable exercise of the state's police power.
Dr. Rogers, a practicing physician in Brevard County, was ordered by the Brevard County Medical Association to discontinue *938 the use of chelation therapy[2] in the treatment of arteriosclerosis. As a result of his refusal to discontinue its use, Dr. Rogers was expelled from the association. Subsequently, pursuant to section 458.1201(1)(p), Florida Statutes (1975),[3] the Florida State Board of Medical Examiners filed an administrative complaint charging Dr. Rogers with unprofessional conduct as defined by section 458.1201(1)(m), Florida Statutes (1975).[4]
*939 The hearing officer, whose findings and conclusions were adopted by the Board, concluded that chelation therapy can best be classified as investigational, that it more likely can be classified as quackery, and that its use outside a controlled environment such as a research institute fails to conform to acceptable and prevailing medical practice. Although not finding that chelation therapy is in any manner harmful to the patient or that Dr. Rogers misled his patients into believing that this methodology of treatment was a cure for arteriosclerosis, the hearing officer determined that Dr. Rogers failed to demonstrate that chelation therapy results in any patient benefit in terms of organic process and recommended that Dr. Rogers be reprimanded, be ordered to cease and desist from employing this treatment, and be placed on probation for one year during which time he should demonstrate the type of exemplary conduct required of a duly licensed physician.
Quashing the Board's order, the district court determined that neither the Board nor the Brevard County Medical Association had made any finding that chelation therapy is in any respect harmful or hazardous to the patient, that Dr. Rogers allowed his patients to make their own choice as to whether to begin this treatment after full disclosure that this methodology has not been proven effective, that chelation therapy is widely used as a treatment for arteriosclerosis by a definite minority of the medical profession, that Dr. Rogers never claimed it was a cure, and that there was no allegation or proof of fraud, misrepresentation, coercion, or overreaching. The district court acknowledged the state's authority to regulate the medical profession but held that the Board's action was not reasonably related to the public's health and welfare. It concluded that the Board, on the record presented for review, could not prohibit Dr. Rogers from administering chelation therapy.
Entrusted with the enforcement of appropriate standards for the practice of medicine, the Board, in restricting Dr. Rogers' professional activities, was acting under the state's police power and pursuant to sections 458.1201(1)(m) and 458.1201(1)(p). Although the state has the power to regulate the practice of medicine for the benefit of the public health and welfare, this power is not unrestricted. The regulations imposed must be reasonably related to the public health and welfare and must not amount to an arbitrary or unreasonable interference with the right to practice one's profession which is a valuable property right protected by the due process clause. Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); Dent v. West Virginia, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889).
Under the particular facts of this case, we conclude that the Board's action unreasonably interferes with Dr. Rogers' right to practice medicine by curtailing the exercise of his professional judgment to administer chelation therapy. The record before us fails to evidence harmfulness as a reasonable basis for the Board's action in restricting use of this treatment. Cf. Golden v. McCarty, 337 So.2d 388 (Fla. 1976). Furthermore, the evidence demonstrates that no fraud or deception was exercised by Dr. Rogers upon his patients who were fully informed of the nature of the procedure and the possibility of no improvement. Sanctions were imposed against Dr. Rogers because he utilized a modality not accepted by the Board as having been proven effective, not because the Board found that the treatment was harmful or that Dr. Rogers had defrauded his patients into believing that chelation treatment was a cure for their conditions. The Board's findings do *940 not support a conclusion of quackery, and the state-imposed limitation on the administration of chelation treatment has not been shown by the evidence to have a reasonable relationship to the protection of the health and welfare of the public.
Accordingly, based upon the record in this case, we hold that the Board's action is an unreasonable exercise of the police power, and we affirm the result of the decision of the district court quashing the order of the Board.
It is so ordered.
SUNDBERG, C.J., and ADKINS, BOYD, OVERTON, ENGLAND and McDONALD, JJ., concur.
NOTES
[1] Article I, section 2, Florida Constitution, provides:

All natural persons ... . have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness... .
[2] The district court in its decision here under review explained in detail the nature of chelation therapy:

The record reveals that chelation therapy consists of a series of intravenous injections of a chelating drug, usually disodium ethylenediamine tetraacetic acid (hereafter disodium EDTA, Na2 EDTA, or EDTA). Each injection takes approximately three to four hours to administer, and a normal course of treatment usually involves twenty such injections. The treatments are specifically intended to treat arteriosclerosis (hardening of the arteries), therosclerosis (deposits on the inner lining of the arteries), and other generalized circulatory deficiencies caused by excess calcium in the circulatory vessels. The common chelating agent, Na2 EDTA, was originally discovered by I.G. Farben in the 1930's and is widely used as a food preservative. EDTA intravenous treatment is often recommended for lead poisoning and other diseases requiring removal of heavy metals from the body. Chelation treatments were widely used during World War II in treating sailors who had contracted poisoning from leaded paint. Since World War II more than 1500 scientific articles and studies have been published concerning practically every application of the chelating process in the body. Many of those articles are contained in the record.
The precise chemical reaction whereby metals, or calcium, are removed from the body through chelation is not yet completely known nor understood. However, through the years, many doctors have observed that after EDTA infusion, the urine calcium level rises and remains at relatively high levels for some months after administration of the treatments. The theory, now generally agreed upon by chelation proponents, is that the chelating salt binds with ionic calcium in the blood, causing a temporary calcium deficiency in the blood. This is rapidly replaced by calcium in precipitate form ionizing in the bloodstream. This calcium, known as metastatic calcium, comes from the walls of the blood vessels and from calcium precipitate in every cell. Many experts believe that the metastatic calcium sludge in each cell causes the cells gradually to disfunction. This phenomenon, coupled with the better known effects of calcium deposits on the interior walls of the blood vessels, results in a gradual decline in blood flow and cell function. Thus, if the pernicious calcium buildup can be prevented or reversed, cells and vessels can continue to function well into old age, reducing the inevitable effects of hardening of the arteries and other vascular occlusive diseases.
The record is replete with claimed instances of dramatic restoration of blood flow to the extremities resulting in arrest of gangrene, restored sensation, increased temperature and return of normal color to toes, fingers, hands and feet after chelation treatment. In one exceptionally dramatic case history, Reynolds Hall, a patient of petitioner, allegedly regained his sight during his seventh chelation treatment.
Chelation therapy is, then, infusion of a chelating agent (generally Na2 EDTA) into the bloodstream over several hours, a treatment which is repeated about 20 times, generally over a period of a month or more.
371 So.2d at 1038-39.
[3] Section 458.1201(1)(p), Florida Statutes (1975), provides:

(1) The board shall have authority to deny an application for a license or to discipline a physician licensed under this chapter or any antecedent law who, after hearing, has been adjudged unqualified or guilty of any of the following:
.....
(p) Being removed or suspended, or having disciplinary action taken, by his peers within any professional medical association, society, professional standards review organization established pursuant to s. 249F of Public Law 92-603, or similarly constituted professional body, whether or not such association, society, organization, or body is local, regional, state, national, or international in scope, or by being disciplined by a licensed hospital or medical staff of said hospital for immoral or unprofessional conduct or willful misconduct or negligence by the person in his capacity as a physician licensed pursuant to this chapter. Anybody taking action as set forth in this paragraph shall report such action to the board within 30 days of its occurrence or be subject to a fine assessed by the board in an amount not exceeding $500.
[4] Section 458.1201(1)(m), Florida Statutes (1975), provides:

(1) The board shall have authority to deny an application for a license or to discipline a physician licensed under this chapter or any antecedent law who, after hearing, has been adjudged unqualified or guilty of any of the following:
.....
(m) Being guilty of immoral or unprofessional conduct, incompetence, negligence, or willful misconduct. Unprofessional conduct shall include any departure from, or the failure to conform to, the standards of acceptable and prevailing medical practice in his area of expertise as determined by the board, in which proceeding actual injury to a patient need not be established when the same is committed in the course of his practice, whether committed within or without this state.