463 A.2d 1065

**Gerald F. CLAIR, M.D., Appellant,**

**v.**

**CENTRE COMMUNITY HOSPITAL, a non-profit corporation; Medical Staff Executive Committee, Richard J. McGuire, M.D., Chief of the Medical Staff and Chairman of the Medical Staff Executive Committee, Individually and as a Representative of the Medical Staff of the Centre Community Hospital, an unincorporated association.**

Superior Court of Pennsylvania.

Argued April 21, 1982.

Filed July 15, 1983.

Petition for Allowance of Appeal Denied Nov. 14, 1983.

26

John R. Miller, Jr., Bellefonte, for appellant.
Robert L. Martin, Bellefonte, for appellees.

Before WICKERSHAM, BROSKY and WIEAND, JJ.

BROSKY, Judge:

This appeal is from the dismissal of exceptions following the denial of an injunction. The sought-for injunction

would have prevented appellee from enforcing the suspension of appellant's physician-staff privileges at appellee-hospital. On appeal, appellant claims that the suspension violated the substantive due process aspects of the Fourteenth Amendment. After careful review, we conclude that appellant does not prevail in these arguments. Accordingly, we affirm.

## FACTS

Out of a lengthy and complex factual history, only a few elements need concern us here. At the direct insistence of the Commissioner and Deputy Commissioner of Health of this Commonwealth, appellee-hospital adopted certain by-laws. They required, in their application, that appellant accept as a patient every third indigent obstetrical or gynecological patient at the hospital. (At the time there were two other such specialists at the hospital.) The Commissioners were concerned that the hospital conform with the State's community service regulations, which were, in turn, established to ensure conformity with Federal Hill-Burton regulations. Their intervention was prompted, in part, by their awareness of appellant's non-conformity. In response, appellant refused to comply with the regulations, explaining that he felt unable to take on an unlimited number of patients and still properly care for them.[1]

Appellant's staff privileges were then suspended, pending an indication of his willingness, in writing, to comply with the bylaw. Appellant sought, and was denied, an order enjoining appellee from enforcing that suspension. He appeals from that denial.

## STATE ACTION

### A. Symbiotic Relationship

Appellant's case is based on an alleged violation of his right to due process of law as guaranteed by the Four-

---

1. It is to be noted that appellant also indicated a willingness to continue with his past practice of taking up to 12 new patients a month, without regard to their economic status, first-come, first-served.

teenth Amendment to the Federal Constitution. The Bill of Rights protects the individual only from governmental action.[2] However, actions ostensibly taken by a private, non-governmental party, can, under certain circumstances, be attributed to the state and thus be subject to constitutional limitations.

Two theories justifying a finding of state action are advanced by appellant. First, he contends that the state and the hospital are in a symbiotic relationship. He sees as evidence of this relationship the receipt by the hospital of Federal Hill-Burton funds for hospital construction, receipt of medicaid and medicare funds, tax benefits and its monopoly position in the community.

It is somewhat doubtful that appellant would prevail in this argument. See *Hodge v. Paoli Memorial Hospital,* 576 F.2d 563 (3rd Cir., 1978). However, we need not decide that issue because we find that there was state action under the second theory.

### B. Close Nexus

The Third Circuit has instructed us that the second theory advanced by appellant is independently adequate to constitute state action.

> Thus, it is possible that a symbiotic relationship between a state and private enterprise could give rise to state action, or in the absence of such a relationship, state action still might be found if "the state is closely involved in the very activity challenged."

*Fitzgerald v. Mountain Laurel Racing, Inc.,* 607 F.2d 589 at 595 (3rd Cir., 1979) quoting *Braden v. University of Pittsburgh,* 552 F.2d 948 at 958 (3rd Cir., 1977).

The enquiry before us then is two-fold: what type of state activity can constitute close state involvement suffi-

---

**2.** See generally, Note, Judicial Review of Private Hospital Activities, 75 Mich.L.Rev. 445 (1976); and Note, State Action: Theories for Applying Constitutional Restrictions to Private Activity, 74 Col.L.Rev. 656 (1974).

cient for a finding of state action; and, did such activity occur here?

■ In determining what can constitute close state involvement, it will be helpful to determine what involvement is insufficient. Regulation of the private institution in general does not sufficiently involve the state in the challenged activity. By virtue of a broad regulatory scheme, the challenged activity does not become a state activity.

The contention that New York's regulation of educational standards in private schools, colleges and universities, e.g., Education Law §§ 207, 215, 305(2), makes their acts in curtailing protest and disciplining students the acts of the State is equally unpersuasive. It overlooks the essential point—that the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury. Putting the point another way, the state action, not the private action, must be the subject of the complaint.

*Powe v. Miles,* 407 F.2d 73 at 81 (2nd Cir., 1968).[3]

This rule has been applied to situations very similar to the one before us—the hiring or firing of hospital staff members.

There can be little doubt that the State of New York plays a substantial role in supervising the operations of private hospitals within its borders. However, this fact does not get us very far. The state, as part of its general regulatory scheme, does not in any way associate itself with or influence the internal decisions of a hospital's board of trustees to hire or fire staff members. The mere fact that New York regulates the facilities and standards of care of private hospitals or offers them financial support does not make the acts of these hospitals in discharging physicians the acts of the state.

3. See also *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). Extensive regulation is insufficient for state action if such regulation is not related to the challenged action.

*Mulvihill v. Butterfield Memorial Hospital,* 329 F.Supp. 1020 at 1023 (S.D.N.Y., 1971). See also *Schlein v. Milford Hospital, Inc.,* 561 F.2d 427 (2nd Cir., 1977).

Under the relevant test, then, the state involvement must be greater than general regulation of the institution. We must determine whether, "... to some significant extent the State *in any of its manifestations* has been found to have become involved in it." *Burton v. Wilmington Parking Authority,* 365 U.S. 715 at 722, 81 S.Ct. 856 at 860, 6 L.Ed.2d 45 (1961) (emphasis supplied).

A more specific definition is found in the landmark case for this type of state action, *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974).

> But the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.

*Jackson,* supra, at 352, 95 S.Ct. at 453.

*Jackson* found that state commission approval of a practice did not create a sufficiently close nexus and indicated that the state would have to more directly mandate the challenged activity.

> Approval by a state utility commission of such a request from a regulated utility, where the commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the commission into "state action."

*Jackson,* supra, at 358, 95 S.Ct. at 456–7.

Four years later, Justice Rehnquist repeated that "... a State's mere acquiescence in a private action [does not] convert that action into that of the State." *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149 at 165, 98 S.Ct. 1729 at 1737, 56 L.Ed.2d 185 (1978). He went on to quote, with emphasis, the necessity for the ordering element of the above quote from *Jackson. Flagg,* supra, 436 U.S. at 165, 98 S.Ct. at

1737–8. See also *Adickes v. Kress & Co.*, 398 U.S. 144 at 171, 90 S.Ct. 1598 at 1615, 26 L.Ed.2d 142 (1970); *Jeffries v. Georgia Residential Finance Auth.*, 678 F.2d 919 at 923 (11th Cir., 1982).

This rule has also been applied to the discharge of personnel. *Graseck v. Mauceri*, 582 F.2d 203 at 208–9 (2 Cir., 1978). Of course, even if the state has demanded the discharge, "the question would remain whether the discharge was in response to their requests." Id.

This nexus and causation was present in a case in which state officials participated "with management in the decisional process" that resulted in an employee's discharge. *Fitzgerald*, supra, 607 F.2d at 600.

■ We are satisfied that the nexus requirement for state action is also present here. The direct involvement of the Commissioner and Deputy Commissioner of Health amounted at least to participation in the decisional process. It would appear to have also taken on a quality of compulsion or ordering. Nor is there any doubt that the termination of appellant's staff privileges was causally related to their intervention. Having found that there was state action in this case, we must next determine whether the termination of appellant's staff privileges involved an interest protectible under the Fourteenth Amendment.

## PROTECTED INTEREST

■ Even though we have decided that state action was present in the challenged action, it does not necessarily follow that the protections afforded by the Due Process clause apply here. In addition to state action, that state action must have deprived appellant of an interest protected by that Amendment. The Fourteenth Amendment does protect "life, liberty and property." "But the range of interests protected ... is not infinite." *Board of Regents v. Roth*, 408 U.S. 564 at 571, 92 S.Ct. 2701 at 2705, 33 L.Ed.2d 548 (1972).

The gravity of the damage inflicted upon appellant is not the controlling factor. The United States Supreme Court has "reject[ed] ... the notion that any grievous loss visited upon a person by the State is sufficient to invoke the ... Due Process Clause." *Meachum v. Fano,* 427 U.S. 215 at 224, 96 S.Ct. 2532 at 2538, 49 L.Ed.2d 451 (1976). "[T]he question is not merely the 'weight' of the individual's interest, but whether the nature of the interest is one within the contemplation of the 'liberty or property language of the Fourteenth Amendment.'" *Morrissey v. Brewer,* 408 U.S. 471 at 481, 92 S.Ct. 2593 at 2600, 33 L.Ed.2d 484 (1972). See *Jago v. Van Curen,* 454 U.S. 14, 102 S.Ct. 31, 70 L.Ed.2d 13 (1981).

This determination must be made in a case such as the one before us.

> Nevertheless, as a threshold requirement the plaintiff in a public employee dismissal case must show that he has either a legitimate entitlement with respect to his job, which would be protected as property under the fifth or fourteenth amendments, or that his dismissal deprives him of a liberty interest protected by those constitutional provisions.

*Mazaleski v. Treusdell,* 562 F.2d 701 at 709 (D.C.Cir.1977). Since we conclude below that appellant had protected liberty interest which was affected, we do not decide whether or not a property interest was also present.

■ Under certain circumstances the discharge of an employee can affect a liberty interest and bring the Fourteenth Amendment into play. The United States Supreme Court has stated that an individual's liberty is impinged upon when the state has "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Roth,* supra, 408 U.S. at 574, 92 S.Ct. at 2707. This holding gave force to that Court's declaration nearly 50 years before that liberty "... denotes not merely freedom from bodily restraint but also the right of the individual ... to engage in any other common occupations of life..." *Meyer v. Nebraska,* 262

U.S. 390 at 399, 43 S.Ct. 625 at 626, 67 L.Ed. 1042 (1923). See *Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589 at 602 (3rd Cir., 1979).

■ The "stigma or other disability" must rise to a certain level before attaining constitutional significance. "... not every negative affect upon one's attractiveness to future employers violates due process..." *Lipp v. Board of Education of City of Chicago*, 470 F.2d 802 at 805 (7th Cir., 1972). *Roth*, supra, 408 U.S. at 575, n. 13, 92 S.Ct. at 2708, n. 13. The negative affect must significantly diminish his chances of obtaining employment. *Truax v. Raich*, 239 U.S. 33 at 41, 36 S.Ct. 7 at 11, 60 L.Ed. 131 (1915). See *Weathers v. W. Yuma County Schl. Dist R–J–1*, 530 F.2d 1335 at 1339 (10th Cir., 1976).

In deciding whether or not the impediment to future employment is substantial, we are dealing with "real-world" considerations, rather than solely with abstract legal theory.[4]

> We agree with appellant that a practical test should be employed in determining the existence of a liberty interest when foreclosure of employment opportunities is alleged.

*Id.*

We do not hesitate in holding that, under the circumstances of this case, appellant had imposed upon him a most grave handicap to his relocation at another hospital. First, virtually every hospital in this country has been the recipient of Federal Hill-Burton funds and is subject to the same regulations which indirectly resulted in his termination. Second, the state agency which precipitated his · dismissal has authority over every hospital in this Commonwealth. The difficulties that confronted appellant will most surely follow him elsewhere. While it cannot be said with certain-

---

**4.** Appellant here was not technically fired as he was not technically an employee of the hospital. However, the termination of his staff status is a sufficiently analogous position for those cases to apply. Namely, as an obstetrician-gynecologist, appellant is unable to practice his profession without the use of hospital facilities.

ty that appellant could never obtain a staff position elsewhere; there is no doubt that most hospitals would be most wary of accepting appellant on their staff with the Damoclean sword of bureaucratic disapproval poised perilously, ready to fall once again.

Another factor reinforces our determination that appellant has suffered the loss of a protected liberty interest. This is the absence of other hospitals nearby where appellant can practice his profession. The record shows that the closest hospital with adequate facilities at which appellant could practice is approximately 30 miles away. Thus, appellant has no alternative hospital at which he could tend to his present patients. This was considered relevant in *Christhilf v. Annapolis Emergency Hospital*, 496 F.2d 174 at 178 (4th Cir., 1974).

The United States Supreme Court has narrowed the scope of *Roth* through subsequent cases. One of these, *Bishop v. Wood*, 426 U.S. 341 at 349, 96 S.Ct. 2074 at 2079, 48 L.Ed.2d 684 (1976), required that the reasons for discharge be publicly disclosed. While such a requirement may be applicable to certain categories of workers, we do not believe that it is wisely used here.

Appellant does not allege that this information has been publicly disclosed. However, the continued non-dissemination of the reasons for appellant's termination would require the combined collusion and prevarication of appellant, appellee hospital and the Pennsylvania Department of Health. That is simply not to be reasonably expected.

An inevitable question in any application appellant may make to join the staff of another hospital is whether he has ever had his privileges revoked. Also inevitable is that such hospitals will check with the hospitals at which appellant has practiced and most likely also with the Department of Health in the states in which he was licensed.

The career experiences of a professional in our society accompany him throughout his working life. He cannot slough off, without a trace, periods of his professional

activity. Like the ghostly Jacob Marley of Dickens' *Christmas Carol,* he carries with him a metaphorical chain representing his past actions. He must be able to satisfactorily account for his prior professional situations. In this context, dissemination of information about his termination from the staff of appellee hospital is certain to occur.

Accordingly, in the case before us, the dissemination requirement of *Bishop* will most assuredly be met. The Fifth Circuit in a case antedating *Bishop* held that it was only necessary that there be "a reasonably anticipated likelihood that [his employer] ... would reveal plaintiff's record to potential employers." *Sims v. Fox,* 505 F.2d 857 at 863 (5th Cir., 1974). See also *Weathers,* supra, at 1339. We find here a much higher level than "a reasonably anticipated likelihood" of dissemination—there is a virtual certainty of it. It would work an injustice if appellant's claim were to fail merely because the inevitable had not yet occurred.[5]

It is a jurisprudential mistake to seize upon isolated words in a case and apply them indiscriminately to other cases without reference to the underlying rationale. The language of any opinion flows from the facts of that case. Different factual contexts may require different rules, and this is the situation before us here. An inflexible application of the dissemination rule announced in *Bishop* —a case involving the discharge of a policeman terminable at will— would be misplaced here. This is, as we have noted above, because the information would have to be disseminated before appellant could obtain a new position.

The vitality of *Roth* was also seemingly dealt another blow in *Codd v. Velger,* 429 U.S. 624 at 629, 97 S.Ct. 882 at 884, 51 L.Ed.2d 92 (1977). *Codd* states that the employer must create and disseminate "a false and defamatory impression about the employee in connection with his termina-

5. We do not believe that our holding here is necessarily inconsistent with *Bishop* or with its source case *Roth.* However, even if it were, we would choose to accord the individual greater protection under the Due Process clause than is mandated by Federal court interpretation. This is, of course, our prerogative.

tion..." This echoes the definition of an employee's liberty interest as the right to be free from being "wrongfully stigmatized by untrue and unsupported administrative charges." *Arnett v. Kennedy,* 416 U.S. 134 at 164, 194 S.Ct. 1633 at 1649, 40 L.Ed.2d 15 (1974).

The Supreme Court has not consistently held to this view. Only eight months before *Codd* was handed down, the Supreme Court held in *Bishop* that the falsity of the information was irrelevant to the violation, *vel non,* of a liberty interest. *Bishop v. Wood,* supra, 426 U.S. at 350 in text and at n. 13 at 350, 96 S.Ct. at 2079–80 in text and at n. 13 at 2080. However, the last vacillation of the United States Supreme Court is the law of the land. Therefore, we must conclude that *Codd* stands and a stigma must be false in order to violate an individual's liberty interest.

If the falsity of the stigma were the only basis for the violation of an employee's liberty interest, appellant would fail on this ground alone. But appellant does not contend that he was terminated for untrue reasons. He argues, rather, that he was terminated for unconstitutional reasons. We do not find that appellant falls at this point. There is another means by which appellant's liberty interest was violated.

This other ground for a liberty interest violation is found in the source case, *Roth.* As quoted above, *Roth* spoke of "a stigma *or other disability* that foreclosed his freedom to take advantage of other employment opportunities." (Emphasis supplied.) The open-ended language of *Roth* enables us to make a realistic determination here. While the barrier imposed upon appellant is not a false stigma, it is most assuredly a "disability." As such, appellant's liberty interest has, without doubt, been affected. The falsity requirement has been applied only to a stigma—not to a disability. Therefore, falsity need not be an essential element of appellant's disability argument.

A contrary result would allow the government to impose arbitrary, capricious and unreasonable regulations upon employees; discharge those who didn't comply; and be free

of judicial review of those actions. Such a result would be inconsistent with our most basic concept of a society ordered in liberty.

We have so far established that state action was present here and that appellant had a protected liberty interest affected by that state action. It now remains for us to determine whether the negative affect upon appellant's liberty interest was constitutionally permissible.

## SUBSTANTIVE DUE PROCESS

■ Not all governmental actions restricting protected liberty interests are impermissible. The Due Process clause only requires that those actions be implemented in conformity with Due Process of Law. One aspect of this is procedural due process—consisting primarily of notice and an opportunity to be heard at a hearing. Appellant has not argued that he was deprived of procedural due process. His claim is that the actions taken against him contravene substantive due process—the other aspect of due process.

This section affords not only a procedural guarantee against the deprivation of "liberty," but likewise protects substantive aspects of liberty against unconstitutional restrictions by the State.

*Kelley v. Johnson*, 425 U.S. 238 at 244, 96 S.Ct. 1440 at 1444, 47 L.Ed.2d 708 (1976).

■ It is not an easy task to have an action held invalid in substantive due process terms. Nor should it be. State actions are "endowed with a presumption of legislative validity, and the burden is on respondent to show that there is no rational connection between the Board's action and its conceded interest in ..." *Harrah Independent Schl. Dist. v. Martin*, 440 U.S. 194 at 199, 99 S.Ct. 1062 at 1064, 59 L.Ed.2d 248 (1979).

■ This standard also applies to regulations in the area before us.

Although the state has the power to regulate the practice of medicine for the benefit of the public health and

welfare, this power is not unrestricted. The regulations imposed must be reasonably related to the public health and welfare and must not amount to an arbitrary or unreasonable interference with the right to practice one's profession ...

*State Board of Medical Examiners v. Rogers,* 387 So.2d 937 at 939 (S.C.Fla., 1980).

■ Thus, we have two questions before us. First, did the regulation implemented against appellant have a rational relationship to a permissible governmental interest? Second, did it constitute an arbitrary or unreasonable interference with appellant's right to practice medicine? We answer the first of these questions in the affirmative and the second in the negative.

The governmental interest served by the hospital by-law was the provision of medical care to indigent individuals. This is both a clearly permissible governmental goal and the action has a rational relationship to its accomplishment.

The interference with appellant's right to practice his profession is a more difficult matter. We do not minimize the serious nature of the interference with appellant's right to practice his profession that resulted from the termination of his staff privileges. Nor do we think it inconsequential that he was required, as a condition of remaining a staff member, to treat every third indigent obstetrical or gynecological patient who comes to the hospital. On the contrary, this is a substantial demand to make upon him. Even in the face of these factors, we are unable to say that the requirement is arbitrary or unreasonable.

The constitution does not grant to this country's citizens a right to medical care. But the government does have the power to advance the welfare of its citizens. In taking actions to ensure that all of its people have access to medical care, the government may, indeed, be operating under a moral, if not a legal imperative. At any rate, it is a permissible objective.

When the government provides funds for the construction of hospitals, it certainly has the ability to exact in return a promise that the hospital will provide medical care without regard to the ability of patients to pay. That medical care obviously cannot be provided without the services of physicians.[6]

The requirement that appellant accept indigent patients is onerous yet reasonable. It is both severe and not arbitrary.[7] In short, it does not work a violation of substantive due process.

## PATIENTS' RIGHTS

Appellant makes a separate argument that his termination interferes with the rights of his patients to be treated by a physician of their choice. In support of this argument, he quotes from the dissenting opinion of Justice Roberts in *Adler v. Montefiore Hospital Ass'n of Western Pennsylvania*, 453 Pa. 60, 311 A.2d 634 (1973). This Court has the greatest respect for the current Chief Justice, but that cannot transmute his dissent into the law of this Commonwealth.

Appellant does not cite any case law recognizing such patients' right which is binding on this Court. Nor need we decide in our disposition of this case whether such a right exists. We hold only that, even if such a right exists, the interests of the state would override it here.

Having found no unconstitutional action, the order of the court below is accordingly affirmed.

WICKERSHAM and WIEAND, JJ., concur in the result.

**6.** It should be noted that these same physicians who are compelled to take on indigent patients also benefit from the use of the hospital in which their non-indigent patients are treated. The burden placed upon appellant is thus accompanied by a benefit.

**7.** It can be said that the requirement is onerous and severe with respect to its impact upon appellant. It is also, however, at the same time, reasonable and not arbitrary in its relationship to advancing the state's interest in providing medical care for the indigent.