Helen THOMPSON, Plaintiff,

v.

CHARLESTON AREA MEDICAL CENTER, INC., a corporation; Don L. Arnwine, President; and Leslie W. Melton, Director of Allied Health Education, Defendants.

Civ. A. No. 80–2346.

United States District Court,
S. D. West Virginia,
Charleston Division.

May 27, 1982.

Crandall, Pyles & Crandall, Charleston, W.Va., for plaintiff.

Frederick F. Holroyd, Charleston, W.Va., for defendants.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

This case comes before the court on defendants' motion for summary judgment. The question for decision is whether the acts of the defendant, Charleston Area Medical Center, Inc. (CAMC), constitute state action for the purposes of 42 U.S.C. § 1983. The parties have filed extensive stipulations of facts, incorporated herein by reference, and have engaged in extensive discovery filed in this action, all of which the court has considered in reaching its decision on this motion.

According to the complaint, plaintiff Helen Thompson was first hired by CAMC on October 6, 1969. In 1973, she was promoted to instructing nurse in the CAMC School of Anesthesiology located in Charleston, West Virginia. She was continuously employed by CAMC from that date until her termination on August 2, 1979. Plaintiff alleges that she was discharged by CAMC, without due process of law, in violation of her First, Fifth and Fourteenth Amendment rights secured by the provisions of 42 U.S.C.

§ 1983. She alleges that CAMC's acts were committed under color of state law. She further alleges that her dismissal constituted a breach of her employment contract. Jurisdiction over the claims brought under 42 U.S.C. § 1983 was invoked pursuant to 28 U.S.C. §§ 1343(3) and (4), 2201 and 2202; pendent jurisdiction was invoked over the breach of contract claim.

Defendants[1] denied all the substantive allegations of the complaint. More specifically, defendants denied the existence of jurisdiction, and have contended throughout that CAMC's actions are not state actions for the purposes of 42 U.S.C. § 1983. This issue is the subject of the motion for summary judgment.

Summary judgment is only appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c), Federal Rules of Civil Procedure. The undisputed, material facts are as follows, from the parties' agreed stipulations of facts and the documents on file.

CAMC is a non-profit corporation organized under the laws of the State of West Virginia. It is essentially exempt from both federal and state taxation. The corporation's Board of Trustees selects its own members. The parties have stipulated that none of the Trustees have been elected or appointed officials of the City of Charleston, or Kanawha County, West Virginia.

CAMC is the product of a merger between two hospitals, Charleston General Hospital and Charleston Memorial Hospital. The merger became effective on January 1, 1972. On February 1, 1977, CAMC entered into an agreement with the Kanawha County Building Commission under which CAMC conveyed its physical facilities and real property to the Building Commission, in exchange for which the Building Commission issued revenue bonds in the amount of $33.2 million in order to permit the con-

---

1. In addition to defendant CAMC, this action was also brought against Don Arnwine, President of CAMC, and Leslie Melton, Director of Allied Health Education. Whether their actions were state actions depends upon whether CAMC is deemed to have been acting under color of state law, for their involvement in this case arises solely out of their positions as officers and administrators of CAMC.

struction, renovation and improvement of the facilities. CAMC now leases these facilities from the Building Commission for a rental sum sufficient to pay off the bonded indebtedness. The rental is derived by CAMC from its revenues. No other monies of the county or state are used to meet the bond obligations. In this connection, the agreement between CAMC and the Kanawha County Building Commission provides as follows:

> The Bonds, together with interest thereon, shall be limited obligations of the Issuer [the Building Commission] payable solely from the rents, revenues and other amounts derived from the leasing or sale of the Hospital Facilities.[2]

Upon completion of payment of the bonds by December 1, 2008, CAMC retains the right to repurchase for the sum of $10.00 the property transferred by it to the Kanawha County Building Commission.

The physical plant occupied by CAMC today covers 1,718,246 square feet. Its book value is $69,304,217; the actual value is $180,415,830.

CAMC's revenues in 1980 were $96,827,-000. Of that amount, 42% ($40,932,500) came from Medicare and Medicaid and other state and federal resources, exclusive of money for the Area Health Education Center (discussed below). In 1979, CAMC's revenues were $84,116,000; 65% of that total ($54,650,940) was derived from the same federal and state sources.

CAMC itself has never received any money under the Hill-Burton Act (The Hospital Survey and Construction Act of 1946, Title VI of the Public Health Service Act). Its predecessor hospitals, however, received a total of six grants under Hill-Burton. Charleston General, between 1958 and 1967, received three grants worth a total of $3,221,748.22. Charleston Memorial, between 1956 and 1969, obtained three grants worth a total of $3,979,462.00. Receipt of these funds carried with it an obligation to provide a certain quantity of free medical services for a period of twenty years. CAMC assumed the obligations of its predecessors at the time of the merger. Its obligation for 1981 was to provide $507,288 in uncompensated care. It is stipulated that CAMC's total Hill-Burton obligation of $5,072,891 will be retired at the end of 1988. The Hill-Burton Act does not, by its terms, purport to control in any way CAMC's personnel relations or the treatment of its employees, including the plaintiff.

Plaintiff relies heavily on the relationship between West Virginia University and CAMC in support of her contention that CAMC is a state actor. West Virginia University is in Morgantown, but part of its medical school is located at CAMC and called the West Virginia University School of Medicine at CAMC (hereinafter WVU). In 1975, West Virginia University purchased land upon which the WVU building is currently located in the midst of CAMC facilities. The WVU-owned physical plant occupies 66,509 square feet, or 3.8% of the overall property of both CAMC and the WVU purchase (1,784,755 square feet). The institutions share a negligible amount of this space; that is, CAMC uses 2,952 square feet of WVU property and WVU uses 9,350 square feet of CAMC space.

The details of the interaction between WVU faculty and students and the CAMC staff are spelled out in the stipulation. In summary, the court notes that the education of WVU students consists of both clinical and classroom components. They perform their clinical duties at CAMC. CAMC provides training assistance and facilities; in return, the students perform routine patient care. WVU and CAMC have entered into reciprocal understandings by which most CAMC staff physicians are given appointments as WVU faculty and the faculty receive CAMC staff privileges. The arrangement is a mutually advantageous one.

---

**2.** The stipulation inadvertently refers to the bonds as "guaranteed" by the Building Commission. From the information contained in the parties' supplemental stipulation and the indenture agreement, it is clear that this stipulation is inaccurate. The bonds are revenue bonds, and constitute limited obligations of their issuer.

This relationship involves only medical students. CAMC also has 100 house officers or residents, physicians who have concluded their four-year medical education and have gone on to what amounts to postgraduate training in one or more areas of specialization. Forty-seven of CAMC's 100 residents are graduates of WVU. The training of these residents is totally a CAMC function, except for behavioral medicine and psychology which are shared by WVU and CAMC. In fact, all the residency programs which now exist at CAMC, except for urology and pathology, were in existence at either Charleston Memorial . or Charleston General prior to CAMC's formation. CAMC receives an annual amount of $320,000 from WVU for its participation in the joint training programs.

In addition to these relationships, CAMC and WVU are involved in the Charleston Area Health Education Center (AHEC). On August 16, 1972, West Virginia University applied for a grant from the federal government to establish the AHEC. The grant proposal's stated purpose was "to combine existing strengths and resources of the medical school and other components of West Virginia University with those of [CAMC] to form the basis of the AHEC." The proposal envisioned the development by the two institutions of improved medical training for physicians, allied health and nursing programs, and cooperative efforts to improve the distribution of health care services and recruitment of health personnel.

Attached to the proposal was an affiliation agreement between the parties dated August 15, 1972, by which they indicated their mutual desire to improve hospital care at CAMC and to advance the education of health professionals in West Virginia. The affiliation agreement set forth the parties' understanding that direct responsibility for health care programs was to be vested in CAMC's Board of Trustees, while West Virginia University was to administer the educational programs, including academic appointments of CAMC staff members. As a caveat to this last provision, the agreement noted that:

CAMC has already established educational programs in nursing and other allied health fields including affiliation agreements with other educational institutions. This agreement in no way voids these previous arrangements. The University will participate in these programs only at the request of CAMC and any other institution already involved and under mutually established rules and regulations.

The proposal was approved by the federal government on September 30, 1972, and WVU entered into Contract No. NIH–72–4392 with the United States. The project director for implementing the contract was Dr. Charles E. Andrews, of the West Virginia University School of Medicine in Morgantown. The five-year contract with the Department of Health, Education and Welfare provided that the federal government would pay $3,634,968, with $475,086 allotted for the first year.

Shortly thereafter, on December 12, 1972, the parties entered into an agreement which made CAMC a subcontractor of WVU for the purpose of planning, developing and operating the AHEC, as detailed in the proposal and the prime contract. The subcontract in general provided that the subcontract would be in effect for the duration of the prime contract, that funding to CAMC would be available on an annual basis, and set a limit ($260,981) on funding available during the first twelve months of the subcontract.

The contract was renewed by HEW for a sixth year, effective October 20, 1977. That renewal contract, filed by plaintiff, indicates that its purpose was to continue funding the development of the AHEC. The cost of this one-year renewal was $871,000. On page 6 of the renewal contract, under the category "Nursing Education," the contract requires WVU to "Provide support for a two-year anaesthesia student nurse training program at CAMC for at least 36 students." It should be noted that WVU was to provide support, not bear primary responsibility which, by inference, is left to CAMC.

For its participation in the AHEC, CAMC received, via West Virginia University, $1,600,000 from the Department of Health, Education and Welfare between 1972 and 1977, and $1,271,334 between 1977 and 1980. The AHEC was in existence for those eight years, but no longer.

In 1975, as part of the development of the AHEC, the School of Anesthesia was created. A portion of the funds received from HEW were specifically earmarked for the School of Anesthesia in the amount of $73,008 for 1977 and $141,746 for 1978. AHEC provided funds for the School of Anesthesia for these two years only.

Plaintiff is a nurse. As noted above, she was a teaching nurse and taught anesthesiology to nursing students. At the time of her dismissal, she was Assistant Director of CAMC's School of Anesthesia.

At the School of Anesthesia, plaintiff's administrative superiors were Nancy Tierney, a certified registered nurse anesthetist, defendant Leslie Melton, Director of the state-created Area Health Education Center and serving under the direction of the Executive Vice President of CAMC. Nurse instructors in the School of Anesthesia were hired by CAMC and answerable only to CAMC. Dr. Charles Reier, Director of the School of Anesthesia, Clinical Professor of Anesthesiology at WVU, and Chairman of the Department of Anesthesiology at CAMC, was head of a corporation under contract to perform anesthesia services to patients of CAMC. Plaintiff and other supervisors of CAMC's School of Anesthesia did not work for Dr. Reier but only took direction from him in his professional capacity, not supervisory capacity. Accordingly, Dr. Reier had no authority to approve leave, establish curriculum, or evaluate plaintiff. The curriculum is basically set by the National Anesthetist Association Accreditation Department.

In the surgical suite, while performing clinical duties, the plaintiff was professionally responsible to the anesthesiologist in charge who may or may not have been present. She was further professionally responsible to the surgeon who may have been involved in clinical instruction and may have held a faculty appointment from WVU. She was also responsible to house officers performing surgery and to the coordinator of scheduling, Clara Poe, at the Memorial Division.

Defendants contend that, on these facts, their actions cannot be considered to have been performed "under color of state law" for the purposes of the Civil Rights Acts. The state action test first articulated by the Supreme Court was the "sifting facts and weighing circumstances" test in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). The Fourth Circuit first used this test to find state action by a hospital receiving Hill-Burton funds in *Simkins v. Moses H. Cone Memorial Hospital*, 323 F.2d 959 (4th Cir. 1963), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964). The *Simkins* case was brought by a group of Negro physicians, dentists and patients against two hospitals in North Carolina, alleging that the hospitals had denied them access to hospital facilities on the basis of race. Pursuant to one provision of the Hill-Burton Act which preserved certain separate-but-equal facilities, and with the approval of the North Carolina Medical Care Commission and the Surgeon General, one of the defendant hospitals completely excluded black patients and professionals, while the other had an all-white staff but admitted a select few Negro patients. The court found state action, and also found unconstitutional the provision of the Hill-Burton Act which preserved separate-but-equal medical facilities and services.

*Simkins* was followed by *Sams v. Ohio Valley General Hospital*, 413 F.2d 826 (4th Cir. 1969). Like *Simkins, Sams* arguably involved state approval of the action complained of, involvement which exceeded the simple receipt of Hill-Burton funds. But the subsequent cases of *Duffield v. Charleston Area Medical Center, Inc.*, 503 F.2d 512 (4th Cir. 1974) (involving the defendant herein), and *Christhilf v. Annapolis Emergency Hospital Association, Inc.*, 496 F.2d 174 (4th Cir. 1974), stand unequivocally for

the proposition that the receipt of Hill-Burton funds alone requires a finding of state action. *Duffield* and *Christhilf* abandon the sifting and weighing approach of *Burton* and *Simkins*, and adopt what is essentially a per se rule, in which the receipt of Hill-Burton funds requires a finding of state action. *See* "Judicial Review of State Hospital Activities," 75 Michigan L.Rev. 445, 461 (1976).

However, shortly after *Duffield* and *Christhilf*, the Supreme Court utilized a new test to discover state action. In *Jackson v. Metropolitan Edison*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), the plaintiff sued a public utility under § 1983 for allegedly shutting off her electricity without adhering to the demands of due process. In finding that the utility's actions were not state actions, the Court held that some direct connection, some "nexus," must exist between the state and the challenged action before state action can be found. *Jackson, supra* at 351, 95 S.Ct. at 453, citing *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1973). The Court was unable to discern any nexus between the state government's regulation of the utility and the utility's termination of plaintiff's services and affirmed the lower court's dismissal of the action. *Jackson* did not overrule *Burton, supra*, but distinguished it, stating that the state's involvement with the restaurant in question in *Burton* was a "symbiotic relationship." *Jackson, supra* 419 U.S. at 357, 95 S.Ct. at 456. Reconciling the *Jackson* "nexus" test with the *Burton* "sifting facts and weighing circumstances" test has been a difficult task, and most courts have adopted a bifurcated method of analysis, applying both tests to the facts before them. *See, e.g., Graseck v. Mauceri*, 582 F.2d 203 (2d Cir. 1978); *Downs v. Sawtelle*, 574 F.2d 1 (1st Cir. 1978); and *Walker v. Pierce*, 560 F.2d 609 (4th Cir. 1977).

Following the *Jackson* decision, the Fourth Circuit recognized the conflict between *Jackson* and its general rule that receipt of Hill-Burton funding requires a finding of state action in *Doe v. Charleston Area Medical Center*, 529 F.2d 638 (4th Cir.

1978), but did not reach the issue because the state criminal abortion statute involved in that case provided support for a finding of state action independent of Hill-Burton funding. This opinion is the last Fourth Circuit opinion holding that CAMC is a state actor.

The conflict was finally resolved in the recent case of *Parvis Modaber v. Culpeper Memorial Hospital, Inc.*, 674 F.2d 1023, 4th Cir., 1982. The court held generally that a private party's actions become state action only when the private entity "acts (1) in an exclusively state capacity, (2) for the state's direct benefit, or (3) at the state's specific behest." (Slip Opinion p. 1025.) The court held specifically that:

> [O]ur former position that the mere receipt of Hill-Burton Act funds makes the recipient's every act state action is inconsistent with *Jackson*, which is controlling on us.

Slip Opinion p. 1026. The court then addressed the plaintiff's contentions that the receipt of Hill-Burton funds, combined with the receipt of Medicare and Medicaid monies and with state regulation of medical licenses, transformed the hospital's activities into state actions. The court concluded:

> The staff privileges decisions of a hospital which receives Hill-Burton Act funds, accepts Medicare and Medicaid patients and reports privileges revocations to state medical licensing authorities do not constitute "state action." As state action is an essential prerequisite to obtaining relief under 42 U.S.C. § 1983, the district court's decision dismissing plaintiff's claim should be affirmed.

Slip Opinion, p. 1027.

Under the first standard of *Modaber*, a defendant will not be found to be a state actor for all purposes unless it acts in an exclusively state capacity, as in cases involving political party control of elements of the electoral process or company-town cases (see footnote 6 in *Modaber*).

Neither will one particular action by a defendant be found to be a state action

under the third standard of *Modaber* unless it was performed at the state's specific behest. The case before the court is fundamentally indistinguishable from *Modaber*. The plaintiff acknowledges that she was hired and fired by CAMC; her suit is brought against CAMC, its President, and the Director of Allied Health Education, whom plaintiff acknowledges is a CAMC employee and serves under the direction of the Executive Vice President of CAMC. The decision to discharge her was allegedly made by these CAMC personnel. Plaintiff has offered no proof of any direct connection between the decision to discharge her and any policy or practice of WVU, the state government, or the federal government. In short, there is no nexus. Rather, her termination was an internal decision made by CAMC. Without any causal relationship between that decision and the state, plaintiff cannot meet the third *Modaber* test, that the defendant act "at the state's specific behest."

Nor is there sufficient evidence to meet the second standard of *Modaber* which requires a showing of direct benefit to the state. CAMC receives Medicare and Medicaid monies, and its predecessors received Hill-Burton grants. Yet these entanglements were specifically held to be insufficient to establish state action in *Modaber*. Since 1977, CAMC leases its premises from the Kanawha County Building Commission, which has issued revenue bonds to finance improvements in those facilities. But those bonds are for all practical purposes paid from rents derived from CAMC which pays them out of its own revenues; no county or state monies are otherwise devoted to satisfying the bond obligations. The hospital, as lessee, retains the responsibility for operating and maintaining the facilities and is entitled to repurchase these facilities and its real estate for the nominal sum of $10.00 when the bonds are retired. Although this connection benefits CAMC, it does not operate for the direct benefit of the state, and does not convert CAMC's actions into state actions. *See Greco v. Orange Memorial Hospital Corporation*, 513 F.2d 873 (5th Cir. 1975), and this court's opinion in *Deardorff v. Thomas Memorial Hospital*, C.A. No. 80–2070 (May 5, 1982).

Plaintiff contends that CAMC's links with WVU make CAMC a state actor. But as the evidence reveals, the relationship between WVU and CAMC, although beneficial to both, has not subjected either party to the control or direction of the other. The day-to-day operation of the medical school simply uses CAMC as a clinical laboratory. WVU developed the AHEC as a prime contractor for the government; CAMC performed work on the AHEC for WVU as a subcontractor. The numerous examples of space and cost-sharing set forth in the stipulations of facts and the attached documents show two separate entities interacting in a cooperative manner, with a scrupulous regard for each other's assets and responsibilities.

The court also notes the comparative sizes of the two institutions. WVU's facilities at CAMC are physically much smaller, as its staff is smaller. To hold that its presence at CAMC converts the latter's actions to state actions would assign a significance to its presence which the facts do not support.

Similarly, CAMC's participation with WVU in the AHEC does not form a basis for a finding of state action. For instance, the cost of the sixth year (1977) of the entire AHEC was $871,000; CAMC's revenues in 1979 were almost one hundred times that amount. CAMC itself received a total of $2,871,334 for its participation in the AHEC between 1972 and 1980; this is a relatively insignificant sum for an institution with 1980 annual revenues of nearly one hundred million dollars. The School of Anesthesia received from the AHEC only $214,754 in the years 1977 and 1978, and received no money at all from that source in 1979, the year plaintiff's employment was terminated. Thus, although the sums received by CAMC from the federal government (via WVU) for the AHEC are not small in an absolute sense, their impact on the operations of a hospital as large as CAMC cannot be deemed significant enough to imbue CAMC's activities with the color of state law.

In short, whether considered singly or together, none of these facts lead to a finding that CAMC acts in an exclusively state capacity or for the state's direct benefit or at the state's behest, as required by *Modaber*. There are connections, to be sure. But, after sifting and weighing all the circumstances, *see Burton, supra*, the court finds that the connections are insufficient in scope and function to transform CAMC, for purposes of the Civil Rights Acts, into a surrogate government like the political parties and company towns which were found to be state actors because of the government-like roles they performed, as described in the cases cited at footnote 6 of *Modaber*. Those political parties and company towns controlled elections and regulated soliciting on town streets, actions which, unlike CAMC's role as a private provider of health care, are quintessentially governmental.

Nor does a sifting and weighing of the facts reveal any fiscal interdependence of the sort necessary for a finding that CAMC acts for the state's benefit. The economic interdependence required for a finding of state action involves a sharing of profits and responsibility. *See* footnote 7 of *Modaber*. But the evidence in this case, as noted above, is devoid of any hint that CAMC shares any of its profits, or any of its risks, with the local or state governments.

Moreover, the evidence makes it plain that there is no connection, no nexus, between the federal, state or local government and the actions of which plaintiff complains. Not only is there no connection between any state policy or mandate and the dismissal of plaintiff, there is also no proof of any nexus between the government (federal, state or local) and the day-to-day operation of either CAMC or its School of Anesthesia. CAMC's connections with WVU and the Kanawha County Building Commission do not alter that conclusion. CAMC's actions were its own, and conversely were not performed at the state's behest.

Accordingly, because the particular acts complained of were not performed at the state's specific behest and because CAMC does not act either in an exclusively state capacity or for the state's direct benefit, the court finds that CAMC's actions were not committed under color of state law. *Modaber, supra*. Therefore, plaintiff does not have a cause of action under 42 U.S.C. § 1983, and defendants are entitled to judgment as a matter of law. Defendants' motion for summary judgment on these federal claims should be granted. Rule 56(c), Federal Rules of Civil Procedure.

For these reasons, it is ORDERED that defendants' motion for summary judgment on plaintiff's claims under 42 U.S.C. § 1983 be, and it hereby is, granted. Plaintiff's claims under 42 U.S.C. § 1983 should be, and they hereby are, dismissed with prejudice.

With no federal claims remaining, the court declines to exercise jurisdiction over the pendent contract claims. Plaintiff's pendent state claims are hereby ORDERED dismissed without prejudice.

There being nothing further for resolution in this case, the Clerk is directed to strike the same from the docket of the court and to forward certified copies of this order to all counsel of record herein.