365 S.E.2d 375

**Mitchell QUEEN**

v.

**WEST VIRGINIA UNIVERSITY HOSPITALS, INC.**

**Charles G. BROWN, Attorney General**

v.

**WEST VIRGINIA UNIVERSITY HOSPITALS, INC., etc., and David Fine, Chief Executive Officer.**

No. 17201.

Supreme Court of Appeals of West Virginia.

July 22, 1987.

Rehearing Denied Feb. 3, 1988.

Larry Harless, Thomas W. Rodd, Morgantown, for Mitchell Queen.

J. Bradley Russell, Charleston, for Brown, A.G.

James K. Brown, Roger A. Wolfe, Jackson, Kelly, Holt & O'Farrell, Charleston, Glen Moffett, W.V. University Hospitals Inc., Morgantown, for W.V. University Hosp.

Donald G. Logsdon, Charleston, for amicus curiae.

James M. Haviland, Charleston, for AFSCME.

McGRAW, Chief Justice:

This appeal consolidates two cases heard and decided by the Circuit Court of Monongalia County. In the first case, Mitchell Queen sought an injunction and other relief against his former employer, West Virginia University Hospitals, Inc. (WVUH), alleging he had been discharged without being accorded the procedural protections he says he is due under article III, section 10 of the West Virginia Constitution. After holding a hearing on Queen's complaint, the circuit court granted his request for a preliminary injunction, which has been stayed pending the outcome of this appeal. The second action stems from a request made by the Attorney General's office pursuant to the West Virginia Freedom of Information Act (FOIA). W.Va.Code § 29B–1–1 et seq. (1986 Replacement Vol.). WVUH refused to comply with the Attorney General's request for information on the grounds that it is not a public body subject to that Act and the Attorney General petitioned the circuit court for an injunction and an order of production. After a hearing, the circuit court ordered that WVUH allow the Attorney General to inspect its records, but that decision has also been stayed so as to allow this Court to consider the matter on appeal.

The facilities of the West Virginia University medical center were opened in 1960 and were financed in substantial part by a "pop tax" of one cent on each bottled soft drink sold in West Virginia. See W.Va. Code § 11–19–2 (1983 Replacement Vol.). The medical center facilities are located on the Evansdale campus of West Virginia University in Morgantown. The board of governors (now the board of regents) operated the medical center as well as several schools of health sciences located on the Evansdale campus.

In 1983 the West Virginia Legislature authorized the regents to issue bonds to finance the costs of repairing and renovating the medical center facilities or constructing a new facility. W.Va.Code § 18–11–26 (1984 Replacement Vol.). In 1984 the Legislature enacted a statute which mandated the creation of a nonstock, not-for-profit corporation to which the medical center facilities would be transferred, and which would then finance the construction of a new medical center. W.Va.Code § 18–11C–1 et seq. (Supp.1987).

I.

As an initial matter, we address the corporate nature of WVUH. Both the Attorney General and Appellee Queen present extensive arguments regarding whether WVUH is a "public" or a "private" corporation and attempt to reconcile their conclusions with West Virginia's Constitution. Article XI, section 1 provides that corporations are to be created under general laws and article X, section 6 forbids that the state grant credit to or become liable for the debts of any corporation.

West Virginia Code § 18–11C–1 et seq. makes extensive legislative findings regarding the West Virginia University medical center, excerpts of which are given below:

(a) The purposes of the existing facilities are to facilitate the clinical education and research of the health science schools and to provide patient care, including specialized services not widely available elsewhere in West Virginia.

(b) These purposes separately and collectively serve the highest public interest and are essential to the public health and welfare, but must be realized in the most efficient manner and at the lowest cost practicable and consistent with these purposes.

(c) The existing facilities require substantial renovation, and it is necessary and appropriate and in the best interests of the State and the citizens thereof that a replacement facility be built as soon as possible instead of such renovation.

\* \* \* \*. \* \*

(e) It is fiscally desirable that the State separate the business and service functions of the hospital from the educational functions of the health science schools ... and that the existing facilities operated by the corporation, and subsequently the new facilities owned and operated by the corporation, be self-suffi-

cient and will remove the tax burden from the State.

(f) A not-for-profit corporate structure with appropriate governance consistent with the delivery of health care to the patient and academic need of the university shall be the best means of assuring prudent financial management and the future economy of operation under rapidly changing market conditions, regulation and reimbursement.

\* \* \* \* \* \*

W.Va.Code § 18–11C–2 (Supp.1987).

The statute authorizes the regents to enter into a long term lease and agreement transferring the assets of the medical center to the corporate entity contemplated by the statute. Section 3 of the statute sets forth a detailed "description" of the corporation to be formed, including:

(a) The directors of the corporation, all of whom shall be voting, shall consist of [nine members serving by virtue of their position with the regents or the medical center] a representative elected at large by the corporation employees and seven directors to be appointed by the governor, subject to confirmation by the senate of the state legislature, which seven appointed directors shall be selected in conformance with the provisions of section six-a [§ 16–5B–6a], article five–B, chapter sixteen of this Code....

(b) The audited records of the corporation shall be reported publicly and to the joint committee on government and finance at least annually.

(c) Upon liquidation of the corporation, the assets of the corporation shall be transferred to the board for the benefit of the university.

W.Va.Code § 18–11C–3 (Supp.1987).

Section 4 of the statute sets forth the details of the agreement between the regents and WVUH, listing the assets to be transferred from the regents "in order to acquire the corporation's agreement to provide" space and financial support for health-science education. W.Va.Code § 18–11C–4 (Supp.1987). The corporation is prohibited from mortgaging the real property involved, and is required to grant exclusive

staff privileges to university faculty and to allow regents' employees to keep their jobs without becoming employees of the corporation. *Id.*

In addition, the transactions involved in the transfer are subject to an independent audit, W.Va.Code § 18–11C–5 (Supp.1987), and members of the corporation's board of directors are required to file for public disclosure conflict of interest statements identical to those filed by state officers and employees, W.Va.Code § 18–11C–6 (Supp. 1987); *see* W.Va.Code § 6B–1–1 (1987 Replacement Vol.).

In summary, the Legislature, in West Virginia Code § 18–11C–1 *et seq.*, has mandated the creation of WVUH to be organized as a nonstock, not-for-profit corporation under the general corporation laws of the state, W.Va.Code § 31–1–1 *et seq.* (1982 Replacement Vol.), for the stated purposes of (1) facilitating health sciences education and research, (2) providing patient care, including specialized services not widely available elsewhere in West Virginia, in the most efficient manner and at the lowest practicable cost, and (3) providing independence and flexibility of management and funding and assuring future economy of operation under changing conditions by separating the business and service functions of the corporation's facilities from the educational functions, and by providing that such facilities will be self-sufficient, removing the tax burden from the state. The corporation thus has statutorily specified purposes and directors, primarily public officers, who have fiduciary duties to the people of the State of West Virginia. The propriety of this structure and these purposes is not contested and presumed correct.

■ WVUH is separate from the regents. Article 11C provides for the transfer of assets from one mandated entity— the regents—to another mandated entity— WVUH—for the purpose of advancing the highest public interest in health care, research, and education. What constitutes an adequate public purpose in mandating a corporation is a legislative determination

which will not be rejected by this Court unless it does not have a reasonable basis or clearly exceeds the power of the Legislature. *See Redevelopment Agency v. Shepard,* 75 Cal.App.3d 453, 142 Cal.Rptr. 212 (1977). Drawing on its substantial experience with statutory corporations, the Legislature has provided that WVUH will discharge an important educational support function.

As a general rule, the general corporation law is the law under which private corporations are organized. However, the terms "public" and "private" corporation are of limited use to us in our discussion of the nature of WVUH. States create corporations, specifying the powers, rights, and duties of these artificial persons, L. Friedman, *History of American Law* 188 (2d ed. 1985), and it is only the power of the sovereign which breathes life into such a fictitious personality. *See generally* Schane, *The Corporation Is a Person: The Language of a Legal Fiction,* 61 Tul.L.Rev. 563 (1987). The very creation of any corporation, whether public, private, or otherwise, is an exercise of state action and authority. A charter is a governmental grant of authority to manage activity which, in effect, permits the incorporators to "govern" a particular enterprise. Under the police power of the state, however, a charter may control the actions, impose restraints, and limit the functions of a corporation. 18 Am.Jur.2d *Corporations* § 13 (1985).

In some circumstances, the term public corporation describes an organization which is made manifest in a statute, without recourse to the general corporation laws. On other occasions, persons referring to public corporations mean those bodies organized under the general corporation laws whose stock is publicly traded. Similarly, the general corporation laws of this state are commonly considered to create private corporations, yet even a cursory review of the purposes of many of the corporations so created would show that they are organized to carry out essentially public functions. *See generally Mullins v. Venable,* 171 W.Va. 92, 297 S.E.2d 866 (1982); *State ex rel. West Virginia Housing Development Fund v. Copenhaver,* 153 W.Va. 636, 171 S.E.2d 545 (1969).

We think that a detailed analysis of the cited constitutional sections would not prove particularly helpful to us, since, from the records of the constitutional debates, it is clear that in adopting the precursors to current article XI, section 1 and article X, section 6 of the West Virginia Constitution the framers were exclusively concerned with stock corporations formed for profit making purposes, which is not the case here.[1] *Debates and Proceedings of the First Constitutional Convention of West Virginia* (C. Ambler ed.) vol. 1, pp. 129, 692; vol. 2, pp. 38, 109, 159, 371, 395; vol. 3, pp. 189, 381, 388, 427, 878, 882; *see Sims v. Fisher,* 125 W.Va. 512, 25 S.E.2d 216 (1943).

■ In the context of examining a constitutional prohibition against special laws pertaining to private corporations, the Florida court has said, "Private corporations

---

1. We also note that nothing in these constitutional provisions prohibits governmental enterprises or corporations which perform governmental functions. The corporate structure is a commonly invoked organizational device used to discharge the functions of government. Our Code is replete with such entities: the Department of Highways, W.Va.Code § 17–2A–1 *et seq.* (1986 Replacement Vol.); the Department of Human Services, W.Va.Code § 9–2–1 *et seq.* (1984 Replacement Vol.); the State Lottery Commission, W.Va.Code § 29–22–1 *et seq.* (1986 Replacement Vol.); the West Virginia Regional Jail and Prison Authority, W.Va.Code § 31–20–1 *et seq.* (Supp.1986); the West Virginia Educational Broadcasting Authority, W.Va.Code § 10–5–1 *et seq.* (1984 Replacement Vol.); the

West Virginia Turnpike Commission, W.Va. Code § 17–16A–1 *et seq.* (1986 Replacement Vol.); the Regional Airport Authorities, W.Va. Code § 8–29–1 *et seq.* (1984 Replacement Vol.); the Higher Education–Industry Partnerships, W.Va.Code § 5B–2A–1 *et seq.* (1987 Replacement Vol.), etc. In our early days on this continent, proprietary and sovereign functions were often combined. Today, we find ourselves striving to work out a new mix of responsibilities and functions, in recognition that corporate interests should be consonant with those of government and the people. *See* Silk, *The Role of the Business Corporation in the Economy and Society,* in *Economic Systems and Public Policy* 83 (Smith and De Vyver, eds. 1966).

are those which have no official duties or concern with the affairs of government, are voluntarily organized and are not bound to perform any act solely for government benefit, but the primary object of which is the personal emolument of its stockholders." *O'Malley v. Florida Insurance Guaranty Association,* 257 So.2d 9 (Fla.1971). WVUH does not fit this definition, and the enabling statute does not violate article XI, section 1 of our constitution.

■ Similarly, the Supreme Court of Arizona has upheld a lease agreement much like the one involved in this case against a challenge that it violated a constitutional prohibition against lending the credit of the state or making a subsidy or donation to a private corporation. *Kromko v. Arizona Board of Regents,* 149 Ariz. 319, 718 P.2d 478 (1986). We quote from *Kromko's* discussion of the constitutional question:

> The purpose behind [the constitutional prohibition] is to avoid the "depletion of the public treasury or inflation of public debt by engagement in non-public enterprise." "Public funds are to be expended only for 'public purposes' and cannot be used to foster or promote the *purely private or personal interests of any individual.*" (Emphasis added.)

> In the instant case, it cannot be seriously contended that the existence of UMCC as a nonprofit hospital does not serve a public purpose....

> Moreover, no "private or personal interests of any individual" will be served by the operation of the hospital under this lease. This conclusion is evident if one reviews its corporate structure under the enabling statute.... Hence, we believe the fear of private gain or exploitation of public funds envisioned by the drafters of our constitution is absent under both [the enabling statute] and the lease.

*Id.* at 320–21, 718 P.2d 479–80 (citations omitted).

The corporate structure mandated by the Legislature for WVUH reserves valuable state owned assets to the benefit of the state. State assets may not be mortgaged or otherwise encumbered as security for the bonds issued by WVUH. The WVUH directors have a fiduciary duty to preserve the assets of the state unencumbered. *See* W.Va.Code § 18–11C–4(b). The obligations of WVUH are not debts or obligations of the state. W.Va.Code § 18–11C–8. WVUH conducts its operations on real property owned by the state and its monumental improvements accrete to the benefit of the state and its people. The constitutional prohibition against expenditure of public funds for a private purpose in article X, section 6 of-the West Virginia Constitution is not violated.[2]

## II.

We next address the question of whether the circuit court erred in granting the Attorney General's request for information under West Virginia's Freedom of Information Act. W.Va.Code § 29B–1–1 *et seq.* WVUH contends that its records are not subject to such disclosure.

■ Under the FOIA, every person may "inspect or copy any public record of a public body," W.Va.Code § 29B–1–3(1), subject only to specific exemptions set forth in West Virginia Code § 29B–1–4. "The disclosure provisions of this State's Freedom of Information Act, *W.Va.Code,* 29B–1–1 *et seq.,* as amended, are to be liberally construed, and the exemptions to such Act are to be strictly construed. *W.Va.Code,* 29B–1–1." Syl. Pt. 4, *Hechler v. Casey,* 175 W.Va. 434, 333 S.E.2d 799 (1985); *see Sattler v. Holliday,* 173 W.Va. 471, 318 S.E.2d 50 (1984).

The statute defines "public body" as:

---

**2.** The Attorney General also directs this Court's attention to article VI, section 39 prohibiting special laws in certain enumerated cases. Although his brief states that one of these cases is any legislation dealing with property held for charitable uses, a reading of the entire provision makes it clear that only special laws regarding the *sale* of charitable property are prohibited by the cited language. This reading is sustained by reference to the language of the 1862 constitution which mandated general laws for securing the title to church property in article XI, section 2. The single case cited by the Attorney General on this matter is not particularly useful, since it does not appear to turn on an interpretation of the cited constitutional provision.

every state officer, agency, department, including the executive, legislative and judicial departments, division, bureau, board and commission; every county and city governing body, school district, special district, municipal corporation, and any board, department, commission, council or agency thereof; and any other body which is created by state or local authority or which is primarily funded by the state or local authority.

W.Va.Code § 29B–1–2(3). The appellant asserts that it is not subject to the FOIA because it is not a "public body" within the meaning of this provision.

If the appellant is covered by the FOIA, it is because it was created by state authority. While the Attorney General directs this Court's attention to cases interpreting the FOIA statutes of various states and both parties point to cases dealing with the federal FOIA statute, none of these cited cases involve the same language as used in the West Virginia Act.[3] They are, therefore, minimally helpful to us in deciding this issue. Instead, our analysis is guided by the words and purpose of the West Virginia FOIA statute and is informed by the factual circumstances of this case.

The appellant's primary contention that it was not created by state authority is that West Virginia Code § 18–11C–1 et seq. itself did not create WVUH, but that WVUH was established under the general corporate provisions of West Virginia law. The appellant's argument asks us to ignore the reality of the circumstances surrounding the creation of WVUH in favor of stilted formalism. The passage of § 18–11C–1 et seq. made possible the development of WVUH, and no contention is made that WVUH would ever have been incorporated were it not for the enabling statute. The statute laid out very specific requirements that the corporation had to meet, § 3, and

clearly contemplated the formation of a single corporation, § 1(d), which would be exempt from normal bidding and approval procedures in transferring the medical center's operation to WVUH, § 5. Unlike the normal corporate entity, the statute was the sine qua non leading to the incorporation of WVUH and that body was, therefore, created by state authority.

Our finding in this matter is consistent with legislative intent and our past cases. The requirements for incorporation are properly viewed as an exercise of the police powers of the state. While the Legislature found it fiscally desirable to separate the business and service functions of the medical center from the regents' educational functions, § 2(e), the Legislature did not relinquish control over the former functions. In fact, a reading of the statute shows that the Legislature intended that WVUH remain accountable as a fiduciary to the people of West Virginia. Seven members of the corporation's board are appointed directly by the Governor and are subject to confirmation by the State Senate. § 3(a). The audited records of the corporation must be reported annually to the public and the Legislature. § 3(b). The transfer from the regents to WVUH is also subject to audit. § 5. Every member of WVUH's board must annually file a conflict of interest statement like those filed by state employees and officers, and these statements are fully available for public disclosure. § 6.[4] Because of the provisions in West Virginia Code § 18–11C–1 et seq. mandating openness and accountability in the management of the corporation and because of the statutory requirement that we liberally construe the disclosure provisions of the West Virginia Freedom of Information Act, W.Va.Code § 29B–1–1 et seq., we hold that West Virginia University Hospitals, Inc. is covered by

---

**3.** The states which use the "created by state authority" language in their FOIA statutes (e.g. Ky.Rev.Stat.Ann. § 61.870(1) (Bobbs/Merrill 1986 Replacement Vol.); Mich. Comp.Laws Ann. § 15.232(b)(iv) (West 1981)) have not had this language interpreted by their courts.

**4.** We note that the requirements regarding board membership, the annual audit, and the filing of conflict of interest statements were added to the original bills introduced in the Legislature. H.B. 1794 and S.B. 676, 66th Leg., Reg. Sess. (1984). These changes indicate a conscious attempt on the part of the Legislature to increase the corporation's accountability beyond that of the normal private corporation.

the latter act and its records are subject to disclosure.

■ The appellant argues that, even if it is subject to the FOIA, the contract requested by the Attorney General is exempt from disclosure under the trade secret exemption of West Virginia Code § 29B-1-4(1). The appellant asserts in conclusory fashion that the contract meets the requirements of that subsection, and that it should be allowed to maintain "business confidentiality." As we have already noted, FOIA exemptions are to be strictly construed. Syl. Pt. 4, *Casey*, 175 W.Va. 434, 333 S.E.2d 799. Additionally, we have held that the party claiming exemption from the general disclosure requirement under West Virginia Code § 29B-1-4 has the burden of showing the express applicability of such exemption to the material requested. *Daily Gazette Co. v. Withrow*, 177 W.Va. 110, 350 S.E.2d 738 (1986). The appellant's conclusory assertions do not meet this burden. *See Freedom Newspapers, Inc. v. Denver and Rio Grande Western Railroad Co.*, 731 P.2d 740 (Colo.Ct.App.1987).

### III.

The final matter before this Court is whether the circuit court committed reversible error in ordering that Appellee Queen be reinstated to his job as food service supervisor with the appellant. The Constitution of West Virginia promises that "[n]o person shall be deprived of life, liberty or property, without due process of law...." W.Va. Const. art. III, § 10. This guarantee protects the individual from deprivations by the State, but not from actions of private persons. *State ex rel. Yanero v. Fox*, 163 W.Va. 222, 232 n. 7, 256 S.E.2d 751, 756 n. 7 (1979); *see Civil Rights Cases*, 109 U.S. 3, 11, 3 S.Ct. 18, 21, 27 L.Ed. 835 (1883).

■ A threshold question for us in considering the appellant's claim of error, therefore, is whether the appellant may be said to be a "state actor" in this circumstance. It is not necessary to be a political subdivision of the state, a state agency, or a purely public corporation to be found to be a state actor for due process purposes.[5] *See, e.g., Clair v. Centre Community Hospital*, 317 Pa.Super. 25, 463 A.2d 1065 (1983). All that is necessary to determine if an entity is a state actor for due process purposes is to evaluate the nature and extent of state involvement so as to determine if its actions are fairly attributable to the state. *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

■ In considering claims under the fourteenth amendment of the federal constitution,[6] the United States Supreme Court has noted that the determination of whether conduct is private or state action admits of no easy answer, *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349-50, 95 S.Ct. 449, 452-53, 42 L.Ed.2d 477 (1974), and it is impossible to fashion a precise formula for making a determination of state action, *Burton*, 365 U.S. at 722, 81 S.Ct. at 860. It is "[o]nly by sifting facts and weighing circumstances" that such a

---

5. The Regional Director of the National Labor Relations Board has written an opinion letter concluding that WVUH is not exempt from the Board's jurisdiction as a political subdivision under 29 U.S.C.A. § 152(2) (Supp.1987). We do not feel that anything in our decision today should affect the Regional Director's opinion. The phrase "political subdivision" is a term of art used with varying degrees of application in numerous statutes. No claim is made here that WVUH is a political subdivision of the state, and we believe WVUH to be an employer as defined by 29 U.S.C.A. § 152(2). Indeed, we agree that WVUH is not a political subdivision in the sense that a county, city, or a board of education is.

6. The language of the federal fourteenth amendment is similar to that found in our article III,

section 10, and so we often refer to federal cases in analyzing West Virginia's due process standard. "Ultimately, however, we must be guided by our own principles in establishing our State standards, recognizing that so long as we do not fall short of the federal standard our determination is final." *Waite v. Civil Service Commission*, 161 W.Va. 154, 158-59, 241 S.E.2d 164, 167 (1977). Indeed, we have repeatedly held that "[t]he provisions of the Constitution of the State of West Virginia may, in certain instances, require higher standards of protection than afforded by the Federal Constitution." Syl. Pt. 2, *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979); *see Adkins v. Leverette*, 161 W.Va. 14, 239 S.E.2d 496 (1977).

determination can be made. *Id.* In *Burton,* the Court found that a privately owned restaurant which leased its location in a city parking building was involved in a symbiotic relationship with the government because the state had "so far insinuated itself into a position of interdependence ... that it must be recognized as a joint participant in the challenged activity." *Id.* at 725, 81 S.Ct. at 862. No such symbiotic relationship existed in *Jackson.* 419 U.S. at 357, 95 S.Ct. at 456. Without such a close relationship, the Court looked to see if there was a sufficiently close nexus between the government and the challenged action. *Id.* at 351, 95 S.Ct. at 453. *Jackson* did not overrule *Burton,*[7] and most courts apply both tests in determining if state action is present under either standard. *Thompson v. Charleston Area Medical Center, Inc.,* 539 F.Supp. 671 (S.D.W.Va.1982); *see Krynicky,* 742 F.2d 94.

■■■ Having examined the record, we find that a symbiotic relationship exists between WVUH and the State of West Virginia such as to make the actions of that entity fairly attributable to the state for due process purposes. In *Orteza v. Monongalia County General Hospital,* 173 W.Va. 461, 318 S.E.2d 40 (1984), we considered the state action question and found that the hospital involved there "lies somewhere in the twilight zone between a government instrumentality and a private charity." That hospital was a nonprofit corporation which leased its facilities from the government, made financial reports to the government, had its board members approved by government, and was obligated to return its assets to the government on dissolution. The appellant's ties to the state are qualitatively and quantitatively stronger than those present in *Orteza.* The differences are substantial enough to return us from the twilight zone to a posi-

tion in space and time such that we can say without hesitation that the appellant is a state actor for due process purposes.

First, the medical center's vital and crucial role in providing clinical education and research opportunities to the health sciences schools operated by the regents, a traditional prerogative and responsibility of the state, will be continued, by legislative mandate, in the new facility to be constructed by the appellant. W.Va.Code § 18–11C–2 and –4(g). The day to day operation and management of WVUH is inextricably intermeshed in an intrainstitutional educational effort; the hospital is a part of the doctor's schoolhouse. This educational role is a major part of the genesis, reason for the existence, and mode of operation of the Morgantown hospital. It is important to note that *only* university faculty have staff privileges with the appellant. W.Va.Code § 18–11C–4(c). No other doctor or dentist may admit or treat patients at the appellant's facility. Similarly, the continued provision of tertiary patient care not readily available elsewhere in West Virginia is also required by the statute because it is essential to the public health and welfare. W.Va.Code § 18–11C–2.

As we have already established, WVUH as a corporation, is, of course, subject to the police powers of the state. Additionally, the entire structure of WVUH and the make-up of its Board of Directors were established through legislative enactment, which assured continuing accountability to the public. The appellant's board members are appointed directly by the Governor (subject to Senate confirmation), are University personnel, or (in the case of two members) hold office due to their position with the hospital. The appellant has nothing to do with selecting its own board, unlike the situations in *Thompson* or *State ex rel. Sams v. Ohio Valley General Hos-*

---

**7.** In fact, *Burton* is repeatedly cited with approval by the *Jackson* Court. The *Jackson* nexus test is most helpful when the primary governmental involvement is through routine regulation or in providing a substantial portion of the entity's funding. *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Krynicky v. University of*

*Pittsburgh,* 742 F.2d 94 (3d Cir.1984) *cert. denied,* 471 U.S. 1015, 105 S.Ct. 2018, 85 L.Ed.2d 300 (1985); *Modaber v. Culpeper Memorial Hospital,* 674 F.2d 1023 (4th Cir.1982). In one of its most recent expositions on the state action question, the Court once again recognized the possibility of requiring due process protections when a symbiotic relationship exists. *Rendell–Baker,* 457 U.S. 830, 102 S.Ct. 2764.

*pital Association,* 149 W.Va. 229, 140 S.E.2d 457 (1965). The appellant's board members must file for public disclosure conflict of interest statements like those filed by public employees or officers, W.Va. Code § 18–11C–6, a requirement we have not seen in any of the cases cited to us by the appellant.

The statute contains numerous other provisions indicative of state involvement. The annual audits of the appellant are reported publicly and are subject to scrutiny by the Legislature. W.Va.Code § 18–11C–3(b). The appellant's facility reposes on state owned land. The appellant is prohibited from mortgaging the existing facilities of the medical center. W.Va.Code § 18–11C–4(b). The assets of the corporation revert to the regents upon liquidation. W.Va.Code § 18–11C–3(c). Regents employees may choose to continue in that capacity and work side by side with the appellant's employees. W.Va.Code § 18–11C–4(d).

Finally, we agree with Appellee Queen that a *Burton* analysis properly includes the public's perception of state involvement. In this case, the traditional role of the medical center as part of the University, its location in the midst of the Evansdale campus, its control over a football stadium parking lot, and the presence of so many state officials on the hospital's board all reinforce the public perception of state involvement. The board of WVUH, unlike the board of any other hospital, is even listed in the Blue Book, the handbook of state government in West Virginia. *W.Va. Blue Book* 288 (1986). Few people outside of the medical center and the Legislature would have any reason to believe that the medical center is anything other than a part of the University.

Having sifted the facts and weighed the circumstances and found the appellant to be a state actor for due process purposes, we must next determine if Appellee Queen's discharge violated any of his due process rights. A first step in determining any claim of due process deprivation is identification of a property or liberty interest. *Orteza,* 173 W.Va. at 466–467, 318 S.E.2d at 45. At this point, we must admit to be somewhat confused by the record

before us, particularly the appellant's representations to the court below.

The appellant now claims that Appellee Queen had no property interest in his continued employment because he had only a unilateral expectation of continued employment. *See Major v. DeFrench,* 169 W.Va. 241, 251, 286 S.E.2d 688, 695 (1982). Nevertheless, at the hearing before the circuit court, the two top executives of the appellant testified to the effect that WVUH would not fire an employee in a "willy-nilly fashion" and that the grievance procedures for WVUH and regents' employees, while different from each other, provided equal employee rights. While the evidence is far from overwhelming, we cannot say that the circuit court, acting as fact finder, was clearly in error in determining that Appellee Queen had more than a unilateral expectation of continued employment sufficient to support a property interest in continued employment with the appellant. *See* Syl. Pt. 1, *Trenton Construction Co. v. Straub,* 172 W.Va. 734, 310 S.E.2d 496 (1983); *see also Cook v. Heck's Inc.,* 176 W.Va. 368, 342 S.E.2d 453 (1986).

Appellee Queen's primary contention before the circuit court was that his liberty interest in continued pursuit of his profession was infringed by the appellant's termination of his employment. The appellant apparently does not contest Appellee Queen's assertion that he would be stigmatized and foreclosed in future employment opportunities if the fact that he was terminated for falsifying his time records became known. *See* Syl. Pt. 2, *Waite,* 161 W.Va. 154, 241 S.E.2d 164. Instead, the appellant relies on its position that it has not yet made this stigmatizing accusation public. *See Freeman v. Poling,* 175 W.Va. 814, 338 S.E.2d 415 (1985). Initially, we are not inclined to relieve the appellant of any possible liability because it did not reveal the specific reason for Appellee Queen's discharge to the Department of Employment Security. *See* W.Va.Code § 21A–10–7 (1985 Replacement Vol.). Our primary concern, however, is a more basic one. Liberty is freedom from arbitrary or despotic control. *Webster's Third New International Dictionary* (1970). Our decisions have recognized a liberty interest in

continued employment with a state actor based on "freedom from an arbitrary non-retention devoid of protective procedures" which would assure fair, rational decision-making. *Major*, 169 W.Va. at 255–56, 286 S.E.2d at 697.

Thus, we are willing to continue our analysis on the assumption that Appellee Queen had some constitutionally protectable property or liberty interest.

Outside of the criminal arena, the scope of due process procedures required in any given case depends on the particular circumstances involved. *Waite*, 161 W.Va. 154, 241 S.E.2d 164; *North v. West Virginia Board of Regents*, 160 W.Va. 248, 233 S.E.2d 411 (1977). In making this determination, we have considered the nature of the private interest, the risk of erroneous deprivation with existing procedures, the probable value of existing safeguards, and the state actor's interest. Syl. Pt. 5, *Major*, 169 W.Va. 241, 286 S.E.2d 688. While generally due process must be given before a deprivation occurs, the predeprivation procedures required may be less if adequate postdeprivation procedures are promptly available. *North*, 160 W.Va. 248, 233 S.E.2d 411.

In the instant case, Appellee Queen's interest in continued employment is strong, but, unlike the litigants in *Waite*, *North*, and many of our other due process cases, he has not made the Court aware of any procedure promised by the appellee. Appellee Queen is not due the full panoply of rights available to a tenured civil service employee. On the other hand, a person employed by a state actor cannot be summarily discharged without any procedural protections, because the fundamental promise of due process is freedom from arbitrary treatment; the procedures must be sufficient to insure that the action is fair and based on reasonable standards. *Major*, 169 W.Va. at 251, 286 S.E.2d at 694–95.

The United States Supreme Court has recently ruled that a person with employment status similar to Appellee Queen is entitled to pretermination notice of charges and an opportunity to respond, but not to a full evidentiary hearing before a neutral fact finder.[8] *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). A primary purpose of these pretermination procedures is to provide an initial check against mistaken decisions. *Id.* at 545, 105 S.Ct. at 1495. It is not yet clear just what the federal courts will determine to be adequate notice and a meaningful opportunity to respond, and we, of course, reserve our option to extend broader protections to workers than the federal courts may require. Syl. Pt. 2, *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859; *Adkins v. Leverette*, 161 W.Va. 14, 239 S.E.2d 496. We do not now attempt to lay out a formula for due process protections for nontenured, non-civil service employees, as each case will present different underlying facts. Nevertheless, we feel that Appellee Queen fully understood the charges against him and responded fully to those charges, affirmatively indicating that he had presented all the information he cared to. We see nothing in the record to make us think that he was erroneously deprived of his liberty or property interests.

In this case, it appears that adequate safeguards were utilized, or might have been invoked by Appellee Queen. It is important to note that this was not the first time that Appellee Queen had been charged with falsifying his time records. In August 1985, his supervisor met with him and discussed this matter. At that time, Appellee Queen signed a memorandum which included an admonition to only record hours actually worked. Then, on March 18, 1986, Appellee Queen was called in to meet with two of his supervisors. From his testimony below, it is clear that he understood fully who had made the charges against him and the nature of the surrounding circumstances. Appellee Queen also testified that he denied the charges and explained his position fully. He once again met with supervisory personnel on March 27, 1986, at which time they informed him they had conducted an

---

8. In *Loudermill*, the Court's assessment of pretermination protections due was made considering the availability of adequate post-termination procedures. *Loudermill*, 470 U.S. at 546–47, 105 S.Ct. at 1495–96.

investigation, and that a number of his fellow employees had seen him coming in later than he indicated on his time card. Once again, Appellee Queen testified he was given the opportunity to fully respond to the charges.[9] At the close of the second meeting, he was given a termination letter which referred to the previous warning in 1985 and indicated that, in his role as a supervisory employee he had been expected to set an example for the employees working under him and his behavior in falsifying his time records was inexcusable. Appellee Queen testified that he made a deliberate decision not to invoke the appellant's grievance procedure in an attempt to regain his job.

Given the specific facts of this case, we think that Appellee Queen received adequate notice of the charges against him and was given a meaningful opportunity to respond to those charges. Therefore, we vacate the preliminary injunction issued by the Circuit Court of Monongalia County.

Affirmed in Part, Vacated in Part.

**9.** Appellee Queen never asked for more time to respond to the charges, to be represented during these meetings, or to confront and cross-examine his accusers. If these opportunities had been refused him by the appellant, we would question just how meaningful his opportunity to respond was. We do not feel that a state actor's interest in expeditious decisionmaking on personnel matters is such to preclude the invoking of these procedural protections by an employee.